CYNTHIA L. RICE, Esq. (SBN 87630)
DISABILITY LAW UNITED
611 Mission Street, Ste. 400
San Francisco, CA 94105
Telephone: (303) 551-9389
Email: crice@dlunited.org

LAURA MURCHIE, Esq.*
DISABILITY LAW UNITED
1905 Sherman Street, Ste. 200 #1281
Denver, CO 80203
Telephone: (404) 912-5234
Email: lmurchie@dlunited.org

ELENA HODGES, Esq. (SBN 805655)
PANGEA LEGAL SERVICES
391 Sutter Street, Ste 500,
San Francisco, CA 94108
Telephone: 415-757-9917
Email: elena@pangealegal.org

*Attorneys for Plaintiffs*

**pro hac vice forthcoming*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

ULISES PEÑA LOPEZ, an individual; ABY PEÑA, an individual; and E.P., a minor, by and through her guardian and mother, ABY PEÑA

Plaintiff,

v.

UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY - IMMIGRATION AND CUSTOMS ENFORCEMENT; THE GEO GROUP, INC.; and CORECIVIC, INC.;

Defendants.

Case No.: ________________

**COMPLAINT**

## INTRODUCTION

1. Plaintiffs Ulises Peña Lopez ("Mr. Peña Lopez" or "Ulises"), his U.S. citizen wife Aby Peña ("Mrs. Peña" or "Aby"), and their young U.S. citizen daughter, E.P. (collectively, "Plaintiffs"), were living happily and peacefully in Sunnyvale, California, when, on February 22, 2025, the trajectory of their lives changed drastically.

2. Immigration and Customs Enforcement ("ICE") officers violently arrested and beat Ulises, causing a medical emergency that required hospitalization and catalyzed a cascade of harms to Ulises and his family. ICE officers then interfered with medical care and access to counsel. ICE transferred Ulises straight from the hospital to detention. Ulises spent the next six-plus months detained at two different immigration detention centers in California's Central Valley, each managed by a different private prison corporation: The GEO Group, Inc. ("GEO Group"), and CoreCivic, Inc. ("CoreCivic").

3. During his months of detention, and despite Ulises experiencing health emergencies requiring repeated hospitalizations, ICE and detention staff denied him adequate medical and mental health care, and disability accommodations. As a result of the acts and omissions of ICE, GEO Group, and CoreCivic, Ulises's physical and mental health decompensated in potentially irreversible ways, and he became multiply disabled. In October 2025, ICE deported Ulises to Mexico, where his physical and mental health have continued to deteriorate because of the harms flowing from the violent ICE arrest and subsequent lack of proper medical treatment and disability accommodations throughout his detention.

4. Ulises's wife Aby and their young daughter E.P. witnessed part of the violent ICE arrest and have experienced significant emotional harms due to both the arrest and Ulises's declining health and wellbeing as a result of mistreatment in detention. Aby was diagnosed with post-traumatic stress disorder ("PTSD") and adjustment disorder with mixed anxiety and depression, and she continues to experience pervasive emotional distress, nightmares, grief, and worry for her husband and daughter. Witnessing her father's violent arrest has deeply impacted E.P., who has regressed in her development, become fearful and anxious around strangers, has trouble spending any time away

from her mother, and wakes up in the middle of the night screaming and crying most nights.

5. ICE bears responsibility for the safety and well-being of individuals detained under the provisions of the Immigration and Nationality Act ("INA"), from arrest through detention to release or deportation. The agency is responsible for ensuring compliance with statutory and constitutional protections guaranteed to individuals in ICE custody. This responsibility exists whether detention facilities are operated by ICE or by a private contractor such as GEO Group or CoreCivic. However, ICE has violated those protections, both directly through its employees, and by abdicating its responsibility to oversee and ensure the protection of individuals housed in detention facilities run by private contractors and condoning the violation of rights experienced by Plaintiffs.

6. Plaintiff Ulises brings this action under the Federal Tort Claims Act ("FTCA"), Section 504 of the Rehabilitation Act, the Administrative Procedure Act ("APA"), the Fifth Amendment, and California state laws; and Plaintiffs Aby and E.P. bring claims under the FTCA. They seek accountability and compensation for the lasting physical and mental harm that ICE, GEO Group, and CoreCivic's tortious and unlawful conduct have inflicted on their family.

**JURSIDICTION AND VENUE**

7. This case arises under the FTCA, 28 U.S.C. §§ 2674, 2680; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the APA, 5 U.S.C. § 551 *et seq.* This Court has jurisdiction over the present action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (federal defendant). The Court has supplemental jurisdiction over Plaintiffs' California state law claims pursuant to 28 U.S.C. § 1367. Plaintiffs have exhausted their administrative remedies under the FTCA, 28 U.S.C. § 2671 *et seq.* Plaintiffs presented their claims to each of the proper agencies of the United States of America. The agencies denied the administrative claims on January 7, 2026, and Plaintiffs now file this federal court action within six months of that denial.

8. Venue is proper in this District under 28 U.S.C. § 1402(b) because Plaintiffs Aby and E.P. are residents of this District, Ulises resided in this District until his detention and later removal. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) for the additional reason that a

substantial part of the events giving rise to this claim occurred within this District.

**PARTIES**

9. Plaintiff Ulises Peña Lopez is a disabled individual who formerly lived with his family in Sunnyvale, California. Ulises currently resides outside of the United States.

10. Plaintiff Aby Peña is the wife of Ulises, and the mother of E.P. Aby is a U.S. citizen and resides in Sunnyvale, California, with E.P., and at all times relevant to this complaint she and E.P. resided in Santa Clara County, California.

11. Plaintiff E.P. is the minor child of Ulises and Aby. E.P. was three years old when she witnessed her father's violent arrest and detention by ICE officers. E.P. is now five years old, and appears through her guardian and mother, Aby. E.P. is a U.S. citizen and resides in Sunnyvale, California with Aby.

12. Defendant United States of America ("United States," "federal government," or the "government") is a proper defendant under the FTCA. The United States is liable for the personal injuries of Ulises, Aby, and E.P. caused by the wrongful acts or omissions of its employees, including employees of the Department of Homeland Security ("DHS"), DHS's constituent unit ICE, and private contractors fulfilling non-delegable duties of the federal government. The employees of these agencies were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1346(b).

13. Defendant ICE is an executive agency within DHS and is charged with enforcing federal immigration laws and overseeing the immigration detention system.

14. Defendant GEO Group is a multinational private prison corporation, headquartered in Boca Raton, Florida, and operates jail and prison facilities in the State of California. GEO Group is the owner and operator of the Golden State Annex ("GSA") detention facility located in McFarland, California. GEO Group receives, and at all times relevant to this complaint received, federal funding from ICE to house people detained by ICE in connection with their immigration status at GSA. GEO Group is under contract with ICE to operate GSA under the oversight and

supervision of the ICE San Francisco Field Office.

15. Defendant CoreCivic is a multinational private prison corporation, headquartered in Brentwood, Tennessee, and operates jail and prison facilities in the State of California. CoreCivic is the owner and operator of the California City Detention Center ("California City") located in California City, California. CoreCivic receives, and at all times relevant received, federal funding from ICE to house individuals detained by ICE in connection with their immigration status at California City. CoreCivic is under contract with ICE to operate California City under the oversight and supervision of the ICE San Francisco Field Office.

## FACTUAL ALLEGATIONS

### A. Ulises Comes to the United States, Builds a Life in Northern California with His Family, and Receives Medical Care to Manage Health Conditions.

16. Ulises came to the United States in 2013, fleeing threats and violence in Mexico. He was about eighteen years old. Ulises joined some of his family members and settled in Northern California, working hard to rebuild a safe life in the United States. He matriculated in a carpentry apprenticeship program and became a member of the Nor Cal Carpenters Union. Ulises worked for about a decade in construction as a carpenter.

17. In 2015, Ulises met Aby, a U.S. citizen. They dated and eventually married in 2020. Soon after, they moved into the quiet neighborhood of Sunnyvale, California to build their life together. Despite a difficult pregnancy, Ulises and Aby were lucky to welcome a daughter, E.P., into the world in 2021.

18. Ulises worked consistently and was generally in good health until he began experiencing work-related health issues in 2024. In August 2024, he was diagnosed with a vertebral artery dissection—a tear that occurs in a blood vessel to the brain—that was caused by lifting heavy objects at work. This led to a transient ischemic attack, which is often called a "mini stroke." This condition and the symptoms affected his ability to perform daily life functions. Ulises's neurologist, Dr. Brian Lee, advised him to limit his physical activity to reduce the likelihood of stroke or heart attack. Despite this setback, with regular monitoring and support from his neurologist, Ulises's condition was well-managed, and he was on track with controlling the symptoms associated with his

disability. Ulises had a neurology appointment scheduled for February 22, 2025, to continue monitoring his condition. But Ulises never made it to the appointment. ICE officials violently arrested and detained him the day before, drastically changing the course of Ulises's health and life.

**B. ICE Officers Violently Arrest Ulises, Triggering a Medical Emergency and a Cascade of Harms to Ulises and His Family.**

19. In the early morning of February 21, 2025, Ulises was in the family's truck outside their home and was about to leave for work. Around ten to twelve armed ICE officers wearing tactical gear and face masks surrounded him, positioning several vehicles in a manner that physically blocked the building's driveway, preventing Ulises from leaving. While still sitting in the truck, Ulises called Aby, explaining in a panicked and trembling voice that immigration officers were surrounding him. She immediately ran out from their second-floor apartment to the top of the stairs to see what was happening. The ICE officers yelled at Aby and ordered her to stay where she was, and two ICE officers physically blocked the stairs. All Aby could do was watch from the top of the stairs as ICE officers arrested her husband. E.P., meanwhile, witnessed her father's violent arrest from the family's living room window, which overlooked the parking area where the arrest took place.

20. While Aby and E.P. watched, other ICE officers screamed in English at Ulises, who was still sitting inside the truck. Ulises speaks limited English and did not understand what the ICE officers were saying to him. Before he could attempt to respond, around three ICE officers began hitting the truck with their batons, with one officer repeatedly striking the center of the driver's side window and door frame. These blows badly cracked the window and dented and scratched the vehicle body.

21. Ulises opened his car door to comply with the officers' commands. He told the officers that he was invoking his rights to speak with a lawyer, review a warrant, and to remain silent. The ICE officers did not provide a warrant.

22. Ulises did not resist arrest. Nevertheless, the ICE officers still chose to employ unnecessarily violent tactics when taking him into custody. Multiple ICE officers grabbed Ulises when he voluntarily stepped out of the vehicle. One officer put a gun to his head. Others forced him

to the ground. ICE officers then jerked Ulises up off of the ground and rammed him against the car while beating him with closed fists, striking multiple blows to his ribs and neck. At this point, Ulises was shaking and visibly struggling to breathe.

23. The ICE officers ignored his physical symptoms and distress. They wrenched Ulises's hands behind his back, injuring his shoulder. The ICE officers handcuffed Ulises so tightly that the cuffs cut painfully into his wrists. During the arrest and while loading Ulises into the transport vehicle, multiple officers verbally assaulted him, calling him a "fucking immigrant," "fucking beaner," and "fucking Mexican." The officers yelled threats along the lines of "don't fucking play with me, I'll kick your ass." Ulises began to lose feeling in his extremities.

24. Aby and her daughter were within feet of the attack on Ulises, with Aby standing at the top of the stairs leading down from the apartment to the parking area, and E.P. watching everything from the living room window. Both Aby and E.P. were terrified. Aby's fear and distress was intensified by the fact that she was being physically blocked by ICE agents engaged in the arrest.

25. While the ICE officers blocked Aby, she watched as her husband began to have an apparent panic attack while being violently arrested and informed the ICE officers that Ulises had a medical condition and had an important follow-up appointment the next day. She ran back into the house, grabbed Ulises's medications, and placed them into a plastic bag that she provided to the ICE officers. The ICE officers grabbed the bag and told her that Ulises could get medical attention inside the detention center. Aby attempted to explain her husband's reliance on the medications and immediate medical needs, but an officer responded to the effect of "I don't give a fuck."

26. The ICE officers loaded Ulises into a transport vehicle. As the vehicle was driving away, Ulises began to convulse. The ICE officers drove for a few minutes before pulling into a secluded alley. The officers opened the van doors and pulled Ulises out, throwing him from the vehicle. Ulises, who was still handcuffed behind his back, tumbled out of the vehicle from a height of approximately four feet and struck his head on the ground. The ICE officers began kicking and beating Ulises, punching him in the ribs, stomach, arms, legs, and neck. While he was being beaten on the ground, Ulises recalls the ICE officers yelling threats and insults including "fucking beaner,"

"gonna kick your fucking ass," and "motherfucker." One officer put his hand against Ulises's throat and leaned his full weight onto it, cutting off his air supply.

27. Ulises begged the ICE officers to stop. He was bleeding from the mouth and struggling to breathe. He felt he was being tortured. He thought he was going to die. He lost consciousness twice during the beating. At some point, ICE officers called paramedics to assist.

28. While the paramedics were on the way, Ulises lost consciousness and was not breathing. An ICE officer initiated CPR. As the paramedics arrived, Ulises had regained consciousness but was in extreme distress, shaking, holding his chest, coughing, and having difficulty breathing. The paramedics moved Ulises into the ambulance, cuffed to the gurney. Ulises recalls the paramedics asking ICE officers "why is he like this?" to which the officers responded along the lines of "we don't know, he was chill." The paramedics transported Ulises to El Camino Health Hospital Emergency Room in Mountain View, California. The ICE officers rode in the ambulance with Ulises, preventing any confidential communication between the paramedics and Ulises.

29. The violent and aggressive tactics ICE officers employed against Ulises are consistent with a pattern of increasing violence and impunity during immigration enforcement actions nationwide since January 2025. Documented reports from around the country reflect an agency-wide practice of employing intimidation, violence and racial invective during enforcement actions. ICE agents are obscuring their identities through face coverings, plain clothes, and unmarked vehicles. They are smashing vehicle windows. Particularly concerning, ICE officials are employing escalated use of force against immigrants and U.S. citizens alike, causing serious injury and harm, including death. The violence of these ICE arrests has sparked numerous civil rights and damages actions against the federal government. Agency officials condone these practices, refusing to take disciplinary action in the face of complaints and even promoting officers who engaged in uses of force that violated constitutional rights by using excessive force.

### C. ICE Interferes with Medical Care, Access to Counsel, and Family Visitation During Ulises's First Hospitalization.

30. Upon admission to the emergency room, Ulises was visibly experiencing physical

and emotional distress and in acute pain. His symptoms included difficulty breathing, severe chest pain, numbness on the right side of his face and hand, lightheadedness, nausea, and anxiety. The emergency room doctors diagnosed Ulises with sinus tachycardia (rapid heartrate), lactic acidosis (lactic acid buildup in bloodstream) and demand ischemia (heart muscle not receiving enough oxygen to meet metabolic needs).

31. While in the hospital receiving treatment, Ulises was shackled to his hospital bed and subjected to intimidation by the ICE officers. ICE officers remained in the room with him at all times, preventing Ulises from receiving care with full doctor-patient confidentiality. The ICE officers glared at him in a way that frightened Ulises. The constant presence of multiple ICE officers at his hospital bed had the intended effect. He felt threatened and trapped. The constant, intimidating presence of the ICE officers made Ulises feel unable to safely share the details of his arrest and the violence and assault he experienced at the hands of the ICE officers with his care team, or even fully describe the injuries he had sustained. He feared that if he told the medical staff about the violent beating or the full extent of his injuries, the ICE officers would find a way to hurt him again.

32. At one point, a nurse brought Ulises a piece of paper with the outline of the human body. Ulises had filled out similar papers for past medical visits, so he understood that the purpose of this paper was to mark where on his body he was in pain. Before he could mark up the paper, one of the ICE officers at his bedside snatched the paper from the nurse, preventing Ulises from filling out information related to his pain and injuries. Other nurses had to exercise extreme discretion, such as writing small notes to carefully hand to Ulises, to try and provide medical care in a non-confidential setting. Ulises had discreetly expressed to some of his care team that he did not want the ICE officers to know anything about his medical care, but he was unable to communicate more. The ICE officers' presence ultimately compromised the treating medical staff's ability to provide appropriate care.

33. At some point, one of the ICE officers, who had been part of the arrest and who had ridden in the ambulance, put one hand on top of Ulises's head and the other across the hospital bed, leaning in close to Ulises's face. The officer informed Ulises in a threatening tone that his attorney

was there to see him. Ulises felt afraid and threatened.

34. The ICE officers actively interfered with Ulises's access to counsel, refusing to allow his attorney, Elena Hodges ("Ms. Hodges") any access for multiple hours. Eventually, a non-confidential attorney visit was permitted, conducted in the presence of two armed ICE officers. ICE officers refused to allow Ms. Hodges to speak privately with Ulises even after invoking his constitutional rights to access to counsel. Ms. Hodges spoke briefly to Ulises with an ICE officer flanking the hospital bed and another stationed at the open door, both within earshot. Just as with the medical team, Ulises felt unable to share the details of the assault with his attorney. The lack of confidentiality prevented both Ms. Hodges from asking and Ulises from sharing detailed information about the circumstances of the ICE arrest, the extent of his injuries, and relevant information about his immigration case posture and strategy. The presence of the ICE officers and their conduct left Ms. Hodges feeling gravely concerned for Ulises's ability to access appropriate medical care and legal counsel.

35. Aby came to the hospital to visit her husband but was denied access to him that day. It wasn't until the middle of the next day, February 22, 2025—approximately 30 hours after Ulises had been admitted—that she was finally able to visit her husband. The ICE officers remained present in Ulises's room during Aby's visit. Ulises and Aby believe that it was the ICE officers, and not hospital staff, who prevented Aby from seeing her husband. Her experience during the arrest, her witness to his apparent panic attack while being arrested, and being denied access to her husband in the emergency room all caused Aby to feel terrified and panicked.

### D. ICE Transfers Ulises to GSA, Where ICE and GEO Group Subject Him to Inadequate Medical Care and Disability Law Violations, Resulting in Deterioration of his Physical and Mental Health and Repeated Re-Hospitalization.

36. After spending one night in the hospital, Ulises was discharged from El Camino Health Hospital late in the evening of February 22, 2025. Instead of releasing Ulises to reunite with his wife and daughter, begin recovery from the traumatic arrest, and receive appropriate follow-up medical and mental health care, ICE immediately transferred him overnight to detention. Ulises was

taken to GSA, an immigration detention center and former state correctional facility located in California's remote Central Valley. GEO Group owns and operates GSA, which includes staffing the detention center.

37. Conditions at GSA are comparable to or worse than those in criminal corrections settings, with documented reports of pervasive rights abuses and violations of ICE's Performance-Based National Detention Standards 2011 (revised 2016) ("PBNDS"). The PBNDS are one of the applicable detention standards for immigration detention facilities and are included in the terms and conditions of ICE contracts with private detention facilities operators. The PBNDS are incorporated as a term and condition of GEO Group's contract with ICE.[1] Conditions and treatment at GSA violate both the PBNDS and ICE-GEO Group contract.

38. People detained at GSA have described conditions as unsanitary and unlivable. Medical and mental health related violations and gaps in services are pervasive at GSA. The California Attorney General's Office recently published its fourth immigration detention facilities report, documenting a litany of concerning conditions at GSA, from severely lacking mental health care and poor medical care to insufficient suicide prevention and intervention and over-discipline of detainees, including punishment for making complaints.[2] Seeking to improve detention conditions and halt the facility's violations of the PBNDS, detained people at GSA have launched multiple hunger strikes. Despite this public and private scrutiny, conditions at GSA have not improved.

39. GEO Group detention staff[3] accepted custody of Ulises on February 22, 2025, but failed to perform an adequate health and disability screening or determine what accommodations he would need based on his disabilities.

40. After admission to GSA, Ulises continued to experience severe chest pain, trouble breathing, and neurological symptoms. He collapsed in the recreation yard on February 23, 2025,

---

[1] ICE-GEO Group Contract No. 70CDCR20D00000008 (December 19, 2019).

[2] *See Immigration Detention in California: A Comprehensive Review with a Focus on Mental Health*, CAL. DEP'T OF J. 52–78 (Apr. 29, 2025), https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf.

[3] The terms "GEO Group detention staff" and "GSA detention staff" are used interchangeably and are meant to refer to the people that work in the GSA facility in any department or level, which may include dorm staff, medical staff, managerial staff, and other staff at the detention facility.

just one day after being processed into GSA. Detention staff transported Ulises to the emergency room at Adventist Health Delano Hospital ("Adventist Delano"). Along with sharp chest pain and shortness of breath, Ulises was experiencing numbness and tingling in his chest, face, and arms. These symptoms confused and terrified Ulises, who feared that he was about to have a heart attack or stroke. Adventist Delano discharged Ulises later that day with instructions that he needed to have a follow-up appointment with a primary care provider within one to two days. Despite the doctors at Adventist Delano providing this clear treatment plan, and requirements in the PBNDS stating that detained individuals who require close, chronic, or convalescent medical supervision shall be treated in accordance with a treatment plan conforming to accepted medical practices,[4] GSA detention staff never provided this follow-up appointment.

41. Upon Ulises's return to GSA, detention staff placed him in segregated housing for 24 hours. As a result, Ulises was denied access to services he would have had if he were placed back into his regular dorm. This violated clear standards as Section 2.12 of the PBNDS states that those who are in administrative segregation "shall receive the same privileges available to detainees in the general population" which may include "opportunities to spend time outside their cells," "socializing," or "watching TV."[5] This is because "[a]dministrative [s]egregation status is a nonpunitive status."[6] Generally, medical isolation is used for situations involving communicable disease or high risk for violent behavior because of a mental health condition.[7] But whether an individual is placed in administrative segregation for medical or other reasons, it is distinct from disciplinary segregation.[8] Section 4.3 of the PBNDS also specifically states that "[m]edical isolation shall not be used as a punitive measure."[9] Despite clear guidelines,[10] Ulises was isolated and denied

---

[4] PBNDS Section 4.3 (Medical Care), 258.
[5] PBNDS Section 2.12 (Special Management Units), 181.
[6] *Id.* at 173.
[7] PBNDS Section 2.1 (Admission and Release), 55; Section 4.3 (Medical Care), 270.
[8] ICE Directive 11065.1 Review of the Use of Segregation for ICE Detainees, 2, (Sept. 4, 2013) (distinguishing between administrative and disciplinary segregation).
[9] PBNDS, Section 4.3 (Medical Care), 270.
[10] *See generally* ICE Directive 11065.1 Review of the Use of Segregation for ICE Detainees (Sept. 4, 2013); ICE Policy Number 24002 Review of the Use of Special Management Units for ICE Detainees (Dec. 6, 2024).

access to services, in effect punishing him for having medical and disability related needs.

42. Once back in his dorm, Ulises was subjected to harsh conditions and denied needed accommodations for his medical and disabilities, and GSA staff continued to violate clear guidelines in the PBNDS, including confinement for approximately 18-20 hours per day, freezing temperatures, lights left on all night, denials of phone access, and denials of outdoor access. Section 5.4 of the PBNDS provides that detained individuals "in the general population shall have access at least four hours a day, seven days a week to outdoor recreation" and that during "inclement weather, detainees shall have access to indoor recreational opportunities."[11] The PBNDS also have an explicit provision stating that the facility "shall comply" with the requirements of Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act of 1990, as amended, and any other applicable state and federal disability laws and regulations related to nondiscrimination and accommodation for individuals with disabilities.[12] The PBNDS specifically state that the facility must "act affirmatively" to prevent disability discrimination.[13] Section 5.4 outlines what is required to ensure the facility is in compliance with federal disability laws. GSA staff routinely violated these requirements while Ulises was in their custody.

43. Despite repeated follow-up to demand Ulises's access to counsel rights be respected, his immigration counsel was not able to speak with Ulises confidentially for over 96 hours after his arrest. After a few days at GSA, GEO Group detention staff brought Ulises into a room with around four officials. The officials told Ulises to sign a paper. He refused, asking to speak with his attorney. The officials responded by pounding the table and screaming at Ulises. Officials told Ulises something to the effect of "your lawyer doesn't want to see you and doesn't want to work with you anymore," in an apparent effort to intimidate Ulises and dissuade from pursuing his legal claims. This violated PBNDS Section 6.3 (O), which prohibits reprisals and retaliation related to an individual's decision to seek judicial relief.[14]

---

[11] PBNDS, Section 5.4 (Recreation), 371.
[12] PBNDS Section 4.8 (Disability Identification, Assessment, and Accommodation), 344–56.
[13] *Id.* at 344.
[14] PBNDS Section 6.3 (Law Libraries and Legal Material), Section O (Retaliation Prohibited), 428.

44. Given Ulises's urgent and progressive medical needs, his neurologist sent a letter to ICE on February 27, 2025, informing the facility of Ulises's diagnosis and care needs. The letter stated that Ulises "must be on medication to avoid having a stroke." On February 28, 2025, Ulises had a phone call with his neurologist to discuss his health. His neurologist sent a second letter to the facility stating that Ulises needed further workup for new right-sided neurological symptoms. Ulises appears to have not received appropriate follow-up neurologic workup his neurologist requested.

45. Throughout his detention at GSA, Ulises's physical and mental health continued to deteriorate in potentially irreversible ways. He was hospitalized again on March 3, 2025, due to a severe headache and the sudden onset of numbness on the right side of his body. GSA staff transported Ulises to Adventist Health Bakersfield Hospital ("Adventist Bakersfield") where doctors conducted a CT scan and MRI. Given Ulises's symptoms, the doctors recommended he get both neurology and physical therapy consults within one to two weeks after discharge. The neurology consult was flagged as "urgent." Medical staff at Adventist Bakersfield also prescribed Ulises a cardiac or "heart healthy" diet, an accommodation he never received while detained at GSA. Treating medical staff also directed that Ulises should receive a follow-up MRI due to vision changes and right sided numbness and tingling. Ulises's follow-up consults were delayed or never took place. The urgent neurology consult that Ulises was supposed to receive within one to two weeks after his March 3, 2025, hospitalization did not occur until July 1, 2025. He never received a physical therapy consult.

46. Each time that Ulises received needed medical care outside the facility, GSA staff placed him in solitary confinement again for approximately 24 hours upon his return. GSA staff categorized these placements as "medical isolation," but, as described above, ultimately amounted to de facto disciplinary solitary confinement in violation of ICE policies and procedures.

47. Prior to his arrest, Ulises's vascular condition was well managed. But as a result of his violent ICE arrest and ICE and GEO Group's failure to provide needed evaluations and treatment for his disabilities and other medical conditions, Ulises's vascular injury progressed with new and worsening symptoms, developing additional, severe disabilities that he did not have prior to his arrest

and detention.

48. Ulises put in multiple requests for medical care, both verbally and through tablets provided by GSA, over the months he was detained there. Ulises's requests were often ignored or he did not receive timely or adequate medical care. This is in direct violation of the PBNDS, which specifically states that detained individuals "shall receive timely follow up" to their requests for health services.[15]

49. The onset and worsening of Ulises's symptoms at GSA, which persist as of the date of this filing, included headaches, weakness and numbness on his right side, eye pain, hearing loss, insomnia and nightmares, blurry vision, back pain, and difficulty walking. As a result of injuries sustained during his arrest, Ulises developed difficulty ambulating, which he still deals with today. Ulises eventually received a cane, but this type of mobility device was not needed prior to his arrest and detention.

50. Ulises experienced severe pain on a daily basis in detention. Because of the pain, and progressive numbness and paralysis, Ulises had difficulty doing daily life tasks at GSA. These tasks included bathing, getting out of bed, sitting down in a chair, using the bathroom, dressing himself, tending to his personal hygiene, reading, and eating. Ulises had difficulty walking and sitting down because he lost almost complete control of his right foot and leg. The pain in the back of his head caused headaches, and it radiated down the left side of his body, causing constant pain in his neck, back, and feet. Ulises had difficulty eating because of the spreading numbness and paralysis on the right side of his mouth. He frequently accidentally bit the inside of his mouth or tongue because of the loss of sensation and motor control. These conditions did not exist prior to Ulises's arrest. What little medical care he did receive was vastly insufficient to address these symptoms.

51. GEO Group detention staff assigned Ulises to a top bunk even though he required a bottom bunk given his disabilities. Ulises's weakness and numbness on the right side of his body prevented him from safely climbing to a top bunk. He asked detention staff to reassign him to a bottom bunk but was told that they could not make that change. This refusal was a violation of ICE

---

[15] PBNDS, Section 4.3 (Medical Care), 257.

Directive 6000, "Assessment and Accommodations for Detainees with Disabilities" (February 26, 2025), which specifically states that detained individuals with disabilities "may request and receive appropriate auxiliary aids and services, reasonable accommodations, and modifications to policies, practices, and procedures" which may include "accessible beds."[16] It is unclear why Ulises was denied such a simple accommodation. After a month of painful and humiliating struggles in and out of his top bunk that caused further physical and psychological harm, Ulises coordinated an informal switch with another detained person in his dormitory, risking punishment for doing so.

52. Ulises also developed significant right-sided hearing loss at GSA that severely impeded his daily life activities in detention. His hearing loss made it difficult to use the telephone to speak with his legal counsel and family, interfering with his access to counsel rights and causing significant emotional distress to Ulises and Aby. He also had difficulty hearing GEO Group detention staff when they spoke to him. Despite Ulises making it clear that he had difficulty hearing and understanding verbal communication, GEO Group staff never evaluated his hearing for the purpose of determining whether his difficulty understanding could be accommodated by providing hearing aids, auxiliary aids or equipment, or using additional or alternative forms of communication.

53. Ulises additionally developed vision loss, making it difficult to read without glasses. Although he now required glasses, GSA staff never provided that accommodation. Staff at GSA were aware that Ulises could not see well. They told Ulises that he needed an eye appointment before he could receive glasses, yet he never received an eye appointment. As a result, Ulises was unable to properly read any papers that detention center staff or ICE officers presented to him or requested that he sign. GSA staff did not provide any other assistance or accommodation when he was required to review and sign documents, interfering with his disability and due process rights.

54. Aside from the PBNDS and ICE Directive 6000, DHS regulations implementing Section 504 of the Rehabilitation Act require that detention center staff ensure meaningful access to programs, services and activities of the detention center, by, among other things, evaluating and providing auxiliary aids and services that allow for effective communication when a detained

[16] ICE Directive 6000, 1–2.

individual has impaired sensory skills.[17] Despite his impaired hearing and vision, no accommodations were provided to ensure that Ulises could communicate aurally or read important legal documents.

55. Because he was denied proper identification, assessment and provision of accommodations for his disabilities, Ulises was forced to rely on the goodwill of other detained individuals to assist him with daily tasks, even though the facility was legally supposed to provide him with accommodations. Forcing Ulises to rely on other detainees to assist him with daily life tasks violated disability laws and policies.[18]

56. Ulises's mental health also began to decompensate. Ulises had previously been living a happy and fulfilling life with his wife and daughter, but after ICE violently arrested him, he developed mental health issues that he did not have prior to the arrest. He felt constant, high-severity stress and anxiety about the worsening of his physical health, not only because he was not receiving the care he needed, but because he was terrified that these new issues would become permanent disabilities. The trauma of the arrest caused nightmares, severely impacting his sleep almost every night. In his nightmares, Ulises repeatedly relived the violent ICE arrest and beating. He woke up covered in cold sweat, his heart racing.

57. The harsh conditions at GSA, including periods of solitary confinement, caused more mental health decompensation for Ulises, including overwhelming fear and helplessness. He feared that he would die in detention. Although he presented with symptoms consistent with PTSD, major depression disorder, and anxiety disorder, detention records do not indicate that Ulises ever received a full and appropriate mental health evaluation by detention medical staff or through an external provider for formal diagnosis of all of his mental health issues. Although he was prescribed medication for mental health concerns, Ulises's ongoing symptoms persisted, indicating the medication was insufficient to fully address his medical needs.

---

[17] 6 C.F.R. § 15.60); PBNDS 2011 (rev. 2016), Section 4.8 Disability Identification, Assessment and Accommodation, 344–56 (also stating throughout the policies that facilities must provide effective communication which may include "readers" or "telephone handset amplifiers"); ICE Directive 6000 Assessment and Accommodations for Detainees with Disabilities (Feb. 26, 2025).

[18] *See e.g.* PBNDS Section 4.8 (Disability Identification, Assessment, and Accommodation), 349.

58. GSA detention staff worsened Ulises's already severe physical deterioration and mental health decompensation by verbally abusing and mocking him. GEO Group staff repeatedly ridiculed Ulises because of his disabilities and medical and mental health issues. GSA staff mocked Ulises for his manner of speaking, which was impeded due to the numbness and paralysis in his mouth. Detention staff taunted and laughed at Ulises when he could not hear them, or his speech was hard to understand. GSA staff repeatedly told Ulises to "say it again" and got angry at him for his inability to hear them well. Detention staff used hurtful and derisive language like "motherfucker, you don't get to be asleep" and "you motherfucker, you're never gonna walk again." When Ulises struggled to walk or stand, officers told him to just "sit down on the stick," referring to his cane.

59. GSA staff retaliated against him because there had been some media attention around Ulises's legal case and his claims of disability discrimination and abusive treatment. Detention center staff called him "*la estrellita*" ("little star"), "arrogant," and "spoiled." The PBNDS contain clear standards preventing retaliation. Section 6.3 Law Libraries and Legal Material, state that "[s]taff shall not permit a detainee to be subjected to reprisals, retaliation or penalties because of a decision to seek judicial or administrative relief or investigation of any matter," including "the conditions of confinement or treatment while in detention," "any issue relating to his/her immigration proceedings," or "any allegation that the Government is denying rights protected by law."[19]

60. At night, when Ulises was in bed, GEO Group detention staff repeatedly subjected him to further harassment and targeting. Staff frequently walked through the dormitory and kicked Ulises's bed with their steel-toed boots, the vibrations sending radiating pain into Ulises's back. Detention staff also shined their flashlights into Ulises's eyes, causing him severe eye pain.

61. Not only did this verbal abuse and targeting itself cause mental health problems, but it compounded Ulises's fear and anxiety around accessing or receiving the medical care and accommodations he required. The near-constant ridicule and insults caused Ulises psychological anguish and left him unable to advocate for his health and disability needs.

---

[19] PBNDS Section 6.3 (Law Libraries and Legal Material), 428.

### E. ICE Transfers Ulises to California City, and ICE and CoreCivic Further Subject Him to Inadequate Medical Care and Disability Law Violations.

62. Around late August 2025, ICE suddenly transferred Ulises to California City, a former state prison in California City, California. Community members and local decision-makers expressed significant concerns about inadequate conditions at the facility well before ICE re-opened it as an immigration detention facility. The City Manager sent a letter to CoreCivic, the owner and operator of California City, expressing alarm about the conditions at the facility, reportedly writing that the building was unsafe, violated the fire code, and that the risks to the public's health and safety were so severe that the City could not allow the operation of the facility. Despite this concern, ICE moved forward with re-opening California City while CoreCivic's permit application remained pending, in apparent violation of the permitting, licensing, and public notice requirements imposed by local and state law.

63. ICE's 2025 National Detention Standards ("NDS") is another standard that sets out the basic minimum requirements in immigration detention and are incorporated as a term and condition of the ICE contract with CoreCivic for operation of California City.[20] Conditions and treatment at California City violate both the NDS and ICE-CoreCivic contract. CoreCivic is responsible for staffing California City.

64. Conditions are so horrendous at California City that people detained there filed a class-action lawsuit in November 2025, challenging "dire" conditions and disability related violations at the facility, alleging that:

> Sewage bubbles up from the shower drains, and insects crawl up and down the walls of the cells. People are locked in concrete cells the size of a parking space for hours on end, and officers threaten them with violence and solitary confinement. Food is paltry and people go hungry. Temperatures are frigid . . . . The facility sharply limits access to lawyers, leaving people . . . largely incommunicado. The medical care system at California City is *broken at every level*. People with serious medical conditions such as heart disease, diabetes, and asthma do not receive essential medications at arrival.

[20] ICE-CoreCivic Contract No. 70CDCR25D00000010/P00004 (Dec. 19, 2025), https://www.ice.gov/doclib/foia/detFacContracts/70CDCR25D00000010_P00004_CaliforniaCityCDF_CaliforniaCityCA.pdf.

> When medications are reordered, delivery is interrupted or stopped arbitrarily. Requests for medical attention go unanswered for weeks, or are never answered at all. When people finally see a medical professional, the care they receive is dangerously poor . . . . . Providers fail to document exams, do not address abnormal lab results, and fail to order necessary treatment in a timely manner. People who require medical attention for conditions such as prostate cancer and heart failure are told that there are no contracts for such services. *As a result, people in custody at California City are at severe and ongoing risk of permanent, even life-threatening harm.*
>
> People with disabilities are denied basic accommodations, such as sign language interpreters and wheelchairs . . . . The facility is *structurally inaccessible* for people with mobility disabilities . . . [ICE and CoreCivic] *fail to identify and track people's disability needs, much less accommodate them*. As a result, many people with disabilities struggle to perform basic functions such as bathing, dressing, eating, and drinking. Some are unable to effectively communicate with staff or friends, while others have difficulty getting in and out of bed.

*Ruiz et al. v. U.S. Immigr. & Customs Enf't*, No. 3:25-cv-09757-MMC, Compl., ECF 1, 4–6 (N.D. Cal. Nov. 12, 2025) (emphasis added). A federal judge in this District granted a preliminary injunction in March 2026, holding that plaintiffs were likely to prevail on the merits of their Fifth Amendment claims for inadequate medical care and conditions of confinement, and their First and Fifth Amendment claims for attorney access. *Id.*, 2026 U.S. Dist. LEXIS 66674, at *19–25 (N.D. Cal. Mar. 27, 2026).

65. Ulises, who was among the first individuals transferred into California City, experienced harms that track closely with the abhorrent conditions, medical violations, and disability violations detailed in the *Ruiz* complaint. During the transfer process from GSA to California City, detention staff denied Ulises timely administration of his daily medication, violated his disability rights, and subjected him to unnecessarily harsh conditions. Detention staff handcuffed Ulises despite being on notice that he needed his cane to ambulate. Being handcuffed made it impossible for him to use his cane. Upon arrival at California City, facility personnel confiscated Ulises's cane because it was purportedly "dangerous" and "a weapon" and did not return it to him until hours later.

66. As the transferring facility, GSA detention staff were required to ensure that Ulises

was transferred with "appropriate medication(s) and medical and referral information to ensure continuity of care with the receiving facility's medical services."[21] Ulises's medication was not administered as prescribed, even though the PBNDS specifically state that the Medical Transfer Summary should include information about current medications and that those medications "must be administered en route."[22] The confiscation of Ulises's mobility accommodation, and the failure to ensure continuity of his medical care, violate very clear standards laid out in the PBNDS and federal disability laws.

67. During his intake at California City, Ulises's mistreatment by CoreCivic detention staff[23] continued. He informed the nurse that he needed his daily medication but was told that he first had to go through the intake process and that medication approvals at GSA "did not mean anything" at California City. Processing and intake took over two days. Ulises went through the night without access to food or medication. CoreCivic did not provide any sheets or blankets during the intake process despite the freezing temperatures in the facility. The protracted and dehumanizing intake process felt like torture to Ulises.

68. While detained at California City, all of Ulises's symptoms and conditions worsened considerably because of ICE and CoreCivic's failures to provide adequate medical treatment and disability accommodations. This conduct involved numerous violations of the NDS 4.7 (Disability Identification, Assessment, and Accommodation)[24], as well as Section 504 of the Rehabilitation Act.

69. Despite Ulises's mobility disability that made it very difficult and painful for him to use stairs, CoreCivic staff assigned him to a dorm on the second floor. The sole bathroom for disabled individuals was on the first floor. This forced Ulises to navigate the stairs multiple times a

---

[21] PBNDS, Section 7.4 (Detainee Transfers), 457.
[22] *Id.* at 459.
[23] The terms "CoreCivic detention staff" and "California City detention staff" are used interchangeably and are meant to refer to the people that work in the California City facility in any department or level, which may include dorm staff, medical staff, managerial staff, and other staff at the detention facility.
[24] NDS Standard 4.7(I) ("Facilities are required by federal law, including Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), to ensure that detainees with a disability have an equal opportunity to participate in, access, and enjoy the benefits of the facility's programs, services, and activities.").

day in order to access the bathroom. Ulises repeatedly requested reassignment to a cell on the first floor, but California City staff threatened to "put [him] in the hole" (solitary confinement) in response to these requests. The process of getting himself up and down the stairs was exhausting and physically excruciating, worsening his already severe back pain. The NDS specifically state that detained individuals with mobility impairments, such as those who require a cane to assist them, are protected under federal disability laws—specifically Section 504 of the Rehabilitation Act.[25] An accommodation for an individual with a disability like Ulises would include such things as "accessible housing, [and] toilet."[26]

70. The refusals of CoreCivic detention staff to accommodate his mobility disability also caused Ulises emotional and psychological harm, making him feel humiliated, dehumanized, and mocked for having a disability. Every time he had to go up or down the stairs, Ulises felt terrified of falling down the stairs and not being able to catch himself. After around three weeks, CoreCivic staff finally reassigned Ulises only after another detained man with an open bunk in a first-floor cell convinced the officials to allow Ulises to join his cell.

71. CoreCivic staff stopped distributing Ulises's pain and heart medication on a regular basis despite the daily medication requirements in his medical treatment plan. For instance, in late August or early September 2025, detention center staff failed to give Ulises his medication for around two weeks, then resumed only a portion of his medications without explanation. At one point, around September or October 2025, Ulises went a whole month without receiving his daily medication. Ulises had a clear medication distribution plan that should have been followed, but the staff at California City failed to adhere to the medical care standards outlined in the NDS.[27]

72. Ulises's eyesight continued to deteriorate at California City, with blurriness, black spots, and stripes clouding his field of vision. Ulises received a vision exam at California City that confirmed significant vision impairment, with approximately 100/20 in one eye and 60/20 in the

---

[25] NDS Standard 4.7 (Disability Identification, Assessment, and Accommodation), 137–38.
[26] *Id.* at 138.
[27] NDS Standard 4.3 (Medical Care), 117 ("[m]edication will be distributed according to the specific instructions and procedures established by the health care provider.").

other, but never received any treatment or accommodation for his visual impairment. By the time Ulises arrived at California City he was unable to read materials in default print sizes. California City did not offer any resources in large print, a common disability accommodation.

73. Ulises's hearing also deteriorated at California City, making it nearly impossible for him to hear any instructions from detention staff. As at GSA, CoreCivic detention staff got angry and yelled at him despite his inability to properly hear them, rather than providing any accommodations. Ulises was never provided any accommodation, or auxiliary aids or services for his hearing or vision disabilities.[28]

74. Ulises's hearing- and vision-related disabilities made it difficult for him to express, or even make requests regarding, his health needs. For example, he could not put in medical requests via the tablet, the standard process for requesting medical care, because his vision loss made navigating the tablet inaccessible. When other detained people helped Ulises submit requests through the tablet, they still went unanswered for weeks despite clear guidelines in the NDS outlining the requirement of procedures to ensure that individuals can make sick call requests, and that those requests are "received and triaged by the medical staff within 24 hours of receipt of the request" and that depending on the acuity of the problem, will be seen "within a reasonable period of time."[29] To try and remedy the lack of adequate and timely healthcare, Ulises filed grievances, but detention staff discarded or ignored them. None of his grievances were resolved.

75. Ulises's mental health further decompensated at California City. Detention staff discontinued his sleep and anxiety medication without appropriate justification. Ulises's nightmares got worse, making it hard to sleep. His anxiety deepened, and his pain increased. Ulises felt anguished and powerless. He was terrified of having a heart attack or stroke and dying inside California City without seeing his family again.

76. Ulises's mental health also worsened as a result of the verbal abuse, threats, and

---

[28] NDS Standard 4.7 (Disability Identification, Assessment, and Accommodation), 138 (noting that for those with hearing or vision impairments, auxiliary aids or services should be provided to the individual to allow for effective communication).

[29] NDS Standard 4.3 (Medical Care), 115–16.

mockery directed at him by California City staff. The staff made fun of him for his difficulty speaking, mockingly saying things like "why can't you move your lips" and "speak louder." Detention staff screamed at Ulises to move faster. The CoreCivic staff also frequently threatened to send Ulises to solitary confinement for reasons related to his disabilities. For example, detention staff repeatedly threatened Ulises with solitary confinement for not moving fast enough and for raising concerns about his treatment and disability accommodation needs. The NDS provide clear standards outlining the requirement for grievance procedures, and to ensure there is no retaliation. NDS Standard 6.2 (Grievance System) establishes the standards for grievances, and specifically states that "[s]taff will not harass, discipline, punish, disclose sensitive information about, or otherwise retaliate against a detainee lodging a complaint."[30] Ulises felt psychologically destroyed by the abuse and mistreatment that the detention staff directed toward everyone at California City, in addition to the targeted abuse for which he was singled out. Ulises felt helpless to advocate for himself at the risk of being punished.

77. Other conditions at California City were inhumane and unsafe. The food at California City was frequently inedible. The only food that met his most basic nutritional needs was only available for purchase and he could not afford the expense. The "heart healthy" diet he required as an accommodation for his disabilities was not provided. The temperatures inside the facility were freezing, impacting Ulises's sleep and worsening his back pain, violating NDS Standard 1.1 (Environmental Health and Safety).

78. On several occasions during confidential legal calls, detention staff suddenly appeared a few feet away from Ulises. When Ulises requested confidentiality, detention staff responded to the effect of "you motherfucker, I'm going to listen," and "I can be anywhere I want." This conduct contravened the NDS Standards 5.4 (J) (Privacy for Telephone Calls on Legal Matters) and 5.4 (K) (Monitoring of Detainee Telephone Calls), and 5.4 (L) (Telephone Access for Detainees with Disabilities).

---

[30] NDS Standard 6.2 (Grievance System), 183. *See also* NDS Standard 6.3 (Law Libraries and Legal Materials), Section O, Retaliation Prohibited; NDS Standard 4.7 (Disability Identification, Assessment, and Accommodation) prohibiting discrimination against individuals with disabilities.

**F. ICE Deports Ulises to Mexico, Violating His Rights During the Deportation Process.**

79. In October 2025, ICE deported Ulises. In preparing to deport Ulises, California City detention staff violated multiple rights and policies. Ulises's sensory disabilities meant that he was unable to read or understand any legal papers, including the deportation paperwork the facility staff forced him to sign. California City detention staff told him things along the lines of "what your lawyer says isn't important, we don't care, we're going to deport you. We're going to make you sign whether you want to or not." The officials grabbed Ulises's hand, twisted it, and forced him to put his fingerprint on the document.

80. In the course of the deportation, CoreCivic and ICE staff subjected Ulises to further abuse and mistreatment, in violation of ICE agency and detention facility policies. Detention staff took away Ulises's cane and put him in a van. The grueling deportation journey took around 36 hours. ICE officials left Ulises on the floor of a freezing cold holding room without food for hours. Detention staff failed to provide Ulises with his medications. His wrists were in pain because of how tightly detention staff locked the handcuffs. ICE deported Ulises with only a small supply of medication—aspirin and statin—and no mobility device despite his mobility disability.

81. At every turn, from ICE's brutal arrest of Ulises to the subsequent harms ICE, GEO Group, and CoreCivic staff caused him in detention, Defendants violated Ulises's rights under the Constitution, federal disability law, and California state law.

**G. Ulises Continues to Suffer Severe Harms Due to ICE, GEO Group, and CoreCivic's Violations.**

82. Since his deportation to Mexico, Ulises's physical and mental health has continued to deteriorate as a direct result of the violent ICE arrest and subsequent lack of proper medical treatment and disability accommodations throughout his detention. He is living in hiding due to fear of being tortured or killed. The exacerbation of his existing disability, and the new disabling conditions resulting from the abuse and violation of his rights, have limited the type of work Ulises is now able to perform, and he has struggled to find work.

83. The numbness and paralysis in Ulises's right leg, right arm, and right side of his

mouth continue. Daily life activities remain impaired. Ulises's vision continues to worsen, seeing black spots and stripes. His hearing loss persists, hearing intermittent ringing and whistling sounds. Ulises did not have these disabilities prior to his arrest and detention.

84. To receive medical care, Ulises must travel one and half to two hours to a specialist clinic for appointments and medication. He had to discontinue treatment in late January or early February 2026 because he could no longer afford care. The monthly cost of treatment is more than Ulises makes in a month with intermittent part-time work. Ulises also now requires surgery for an angioplasty with stent placement that would cost approximately between 400,000 to 550,000 pesos ($23,256 to $31,977 USD). This surgery is needed solely as a result of injuries he received during the violent arrest by ICE officers and inadequate medical care he received while detained at both GSA and California City. If Ulises does not receive this surgery, he will need to be on multiple medications for the rest of his life. His monthly medical costs are about 5000 pesos ($290 USD), excluding transportation to the clinic. Both the surgery and the ongoing medication and care are cost prohibitive for Ulises and his family.

### H. Aby and E.P. Experience Severe and Lasting Mental, Emotional, and Psychological, and Harms Due to ICE's Violent Arrest of Ulises.

85. Both Aby and E.P. have also continued to suffer since Ulises's violent arrest by ICE. After witnessing the arrest, Aby has struggled immensely, both in the immediate aftermath and longer term. During the arrest and as the ICE officers drove away with her husband, Aby felt terrified. E.P. witnessed everything and was sobbing in the apartment. Through her own tears and shock, Aby called her mother and a rapid response hotline to try and get help for Ulises. When she learned that Ulises was at El Camino hospital, she brought E.P. to her mother-in-law's and rushed to the hospital. She spent hours at the hospital but was prevented from seeing Ulises. She left, feeling frightened and dispirited, and went to pick up E.P. The next day, February 22, 2025, Aby tried to go visit her husband again and was only able to visit with him nearly 30 hours after he had been arrested and admitted into the emergency room.

86. The immediate aftermath was awful for Aby. In the first few days, Aby had a knot in her stomach and could not eat. Given the violence of the arrest and the medical emergency, she

feared for her husband's health and survival. She knew he was supposed to attend an important follow-up appointment with his neurologist on February 22, 2025, and worried about what it meant that he was unable to access that care given his vascular health issues. She witnessed her husband's decline from being a hardworking breadwinner who was still able to work despite his health condition and disability, to a man with multiple incapacitating disabilities.

87. Aby mental health decompensated sharply in the aftermath of the arrest. She kept reliving the ICE officers beating her husband. Aby began to have nightmares, trouble sleeping, severe anxiety, and loss of appetite. She has developed a fear of loud noises and becomes shaky and afraid when there is an unexpected knock at the door. Aby also experiences severe stress around the well-being and emotional and mental development of their young daughter, E.P., who is now five years old. In the immediate aftermath of her father's arrest, E.P. cried almost constantly, asking Aby "why the men took my dad." Now that she had to single-parent their daughter, Aby had to be strong for E.P., holding in her fear, stress and anxiety. E.P. was constantly waking up screaming, which made sleep for Aby even more elusive.

88. Aby began attending individual and group therapy because of the emotional distress she has suffered because of her husband's arrest and detention. Her individual therapist diagnosed Aby with adjustment disorder with mixed anxiety and depression, and PTSD. Aby continues to experience pervasive stress and emotional distress in connection with Ulises's declining health and wellbeing as a result of his violent ICE arrest and mistreatment while detained.

89. Aside from the emotional and psychological harms to Aby and E.P., Ulises's sudden detention created immense financial strain for the family. Ulises was the family's main breadwinner. Because of his compromised health and disabilities, Ulises is unable to consistently work fulltime in Mexico or anywhere. Without his income, Aby has struggled to provide financially for the family. Aby had been a stay-at-home mom, but with Ulises's arrest and detention, she had to return to work. She was able to secure a job after a few months, but the schedule makes it difficult to juggle being a single parent. Her job requires three shifts a week that begin at 4 a.m. and last approximately 13-13.5 hours. Because the schedule is so irregular, securing outside childcare is nearly impossible and

she must rely on family and friends. Her income is much less than what Ulises previously earned, or could have earned, whether in the U.S. or in Mexico.

90. E.P.'s mental health and well-being have deteriorated significantly since her father was arrested. At just three years old she witnessed several ICE officers violently arrest her father, traumatizing her and catalyzing the onset of emotional and mental health issues. On the day of the arrest and for days after, E.P. alternated between crying inconsolably and staying very silent and not talking to anyone, including her mother. Aby recalls one morning walking out to the living room where she found E.P. sitting in the corner, crying and hugging a photo of her father. It broke Aby's heart to see their young daughter like this.

91. Prior to the arrest, E.P. was an outgoing, curious, and playful child who used to sleep independently in her own bed. E.P. loved playing with the other kids at the playground, church, or the library. She was also very close with her father, and they loved playing together. Nighttime was special for E.P. and Ulises because they had a bedtime routine of reading books and praying together before E.P. went to bed. During the day, she would ride her scooter around or play outside while Ulises did house chores like washing the car.

92. E.P. is now fearful and anxious around strangers, especially men. She is now afraid to sleep alone. She has nightmares where she wakes up multiple times a night screaming. E.P. is jumpy and scared of loud noises, such as the slam of a car door. E.P. has difficulty spending any time away from her mother, telling Aby that she fears people will come take them away, and fears that her mother will be taken away from her. E.P. still asks to this day why "the men" did what they did to her father and worries "the men" will show up at her house.

93. E.P. began therapy a few weeks after witnessing the violent arrest of her father. However, due to Aby's work schedule, they were unable to continue the sessions. E.P. has difficulty understanding what happened, asking her mother why officers would hit her father, and she continues to ask her father if he is still in pain from where the officers hit him.

94. E.P. has also regressed in her development. Around the time when Ulises was arrested, E.P. was progressing well with potty training, but that progress slowed after the arrest and

during Ulises's detention. She was learning to be independent, but is now still dependent on Aby and struggles with separation anxiety when she is not with her mother. E.P. has also struggled to adjust to Aby's new work schedule. When her father was still home, she was used to being with her mother, but since Aby has returned to work that has such an irregular schedule, E.P. often has to spend nights with her paternal grandmother or with her maternal grandparents. The separation, in addition to the traumatic arrest of and separation from her father, has been difficult for E.P.

95. In less than an hour, ICE officials' violent arrest in February 2025 changed the course of Ulises life and the lives of his wife and daughter. He was a construction worker in good health, and an active dad who loved to go for hikes and carry his daughter on his shoulders. Now, Ulises has difficulty with basic life functions like going to the bathroom and maintaining his personal hygiene. He has been separated from his family for nearly a year and a half. The knowledge of the profound impact of his arrest and detention on his wife Aby and their daughter E.P. haunts Ulises. Many of the physical, psychological, emotional, and dignitary harms he continues to suffer may be irreversible. Even so, Ulises and his family remain committed to seeking accountability for the harms they endured at the hands of ICE, GEO Group, and CoreCivic, so that they can finally begin to heal.

## CAUSES OF ACTION FOR ULISES PEÑA LOPEZ

### FIRST CAUSE OF ACTION
### Federal Tort Claims Act: Intentional Infliction of Emotional Distress
### (Ulises as to United States)

96. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

97. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

98. At all relevant times, the federal employees, officials and their contractors referenced above acted within the scope of their employment and/or official duties as employees of DHS, an

agency of the United States.

99. The United States is obligated to ensure the protection of rights and the health and safety of the individuals arrested, detained and confined under the provisions of the INA, and has a nondelegable duty of care to those in its custody. In the course of Ulises's detention, the federal employees, officials and contractors referenced above had a duty to adhere to the contracts between each facility and ICE, and the mandatory and binding requirements of the NDS, the PBNDS, and the ICE directives referenced above. The United States had the affirmative, nondelegable duty to ensure compliance by its employees and contractors with their duty of care.

100. By engaging in the acts described in this Complaint, the federal employees, officials and their contractors referenced above engaged in extreme and outrageous conduct towards Plaintiff Ulises with an intent to cause, or a reckless disregard as to the probability of causing Ulises to suffer severe emotional distress. The violence of his arrest despite Ulises's compliance, executed in front of his family, and the subsequent beating and causing of a medical emergency, constitute an intent to cause, or at least a reckless disregard as to the probability of causing Ulises extreme emotional distress. The manner in which he was treated in detention—both at GSA and California City—and his deportation process constitute willfully and deliberately subjecting Ulises to conditions of civil confinement that are dangerous and amount to punishment, and caused Ulises to suffer severe emotional distress.

101. As a direct and proximate cause of the conduct of United States employees and contractors, Ulises suffered, and continues to suffer, severe emotional distress, and a loss of earnings and earning potential.

102. Under the FTCA, the United States is liable to Ulises for damages arising from the tort of intentional infliction of emotional distress under the laws of the State of California, and damages arising from that intentional conduct.

**SECOND CAUSE OF ACTION**
**Federal Tort Claims Act: Negligence (Emotional Distress)**
**(Ulises as to United States)**

103. Plaintiff realleges and incorporates the allegations set forth in the preceding

paragraphs as though fully set forth here.

104. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

105. At all relevant times, the federal employees, officials and their contractors referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

106. The federal employees, officials and contractors referenced above had a duty to Plaintiff Ulises to act with ordinary care and prudence so as not to cause harm or injury to Ulises in how they executed his arrest and detained him. In the course of his detention the federal employees, officials and contractors referenced above had a duty to adhere to the contracts between each facility and ICE, and the mandatory and binding requirements of the NDS, the PBNDS, and the ICE directives referenced above. The United States had the affirmative, nondelegable duty to ensure compliance by its employees and contractors with their duty of care.

107. By engaging in the acts alleged herein, the federal employees, officials and contractors referenced above failed to act with ordinary care and thereby breached their duty of care owed to Ulises. The United States failed to act with ordinary care and breached its affirmative, nondelegable duty to ensure compliance by its employees and contractors with their duty of care.

108. As a direct and proximate result of the conduct, Ulises suffered substantial emotional distress and the loss of earnings and earning potential.

109. Under the FTCA, the United States is liable to Ulises for the tort of negligence under the laws of the State of California, and damages arising from that negligence.

**THIRD CAUSE OF ACTION**
**Federal Tort Claims Act: Negligence (Conditions of Confinement)**
**(Ulises as to United States)**

110. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

111. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

112. At all relevant times, the federal employees, officials and their contractors referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

113. The federal employees, officials, and contractors described above owed a duty of care to Plaintiff Ulises while he was in their custody. In the course of Ulises's detention, the federal employees, officials and contractors referenced above had a duty to adhere to the contracts between each facility and ICE, and the mandatory and binding requirements of the NDS, the PBNDS, and the ICE directives referenced above. The United States had the affirmative, nondelegable duty to ensure compliance by its employees and contractors with their duty of care.

114. By engaging in the acts described above, federal employees, officials and contractors breached their duty of care owed to Ulises by failing to adhere to federal disability laws, the ICE-GSA contract, the ICE-California City contract, and applicable, mandatory and binding policies established by the NDS, PBNDS, and ICE Directives. Defendant United States breached their affirmative, nondelegable duty to Ulises when they failed to ensure the conditions of confinement did not amount to punishment, failed to abate a known substantial risk of serious harm, and failed to ensure compliance by its employees and contractors with their duty of care.

115. As a direct and proximate result of the referenced conduct by the federal employees, officials, and contractors described above, Ulises suffered harm and injuries, including physical injuries, pain, suffering, loss of freedom, loss of enjoyment of life, and the loss of earnings and earning potential.

116. Under the FTCA, the United States is liable to Ulises for the tort of negligence under the laws of the State of California and for damages arising from that negligence.

**FOURTH CAUSE OF ACTION**
**Federal Tort Claims Act: Negligence (Medical Negligence)**
**(Ulises as to United States)**

117. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

118. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

119. At all relevant times, the federal employees, officials and their contractors referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

120. The federal employees, officials, and contractors described above had a duty to Plaintiff Ulises to provide adequate and appropriate medical care. The United States has an affirmative, nondelegable duty to ensure compliance by its employees and contractors with their duty of care.

121. By engaging in the acts and omissions alleged herein, the federal officers referenced above breached their duty of care owed to Ulises when they failed to provide adequate and appropriate medical care that met relevant professional standards of care and standards of care as outlined by the relevant, mandatory and binding standards and policies referenced above. The United States failed to act with ordinary care and breached its affirmative, nondelegable duty to ensure compliance by its employees and contractors with their duty of care.

122. As a direct and proximate result of the referenced conduct by the federal employees, officials, and contractors described above, Ulises suffered harm and injuries, including physical injuries, pain, suffering, loss of freedom, loss of enjoyment of life, and a loss of earnings and earning potential.

123. Under the FTCA, the United States is liable to Ulises for the tort of negligence under the laws of the State of California and for damages arising from that medical negligence.

**FIFTH CAUSE OF ACTION**
**Federal Tort Claims Act: Assault and Battery**
**(Ulises as to United States)**

124. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

125. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

126. At all relevant times, the federal employees, officials and their contractors referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

127. By engaging in the acts described above, federal employees acted intentionally to attempt to cause, and in doing so, did cause harmful or offensive contact with Plaintiff Ulises resulting in violent injury to Ulises. Federal employees wrongfully, unlawfully, intentionally, and violently forced him onto the ground, held a gun to his head, rammed him into the truck, and beat and kicked him. These actions caused severe, debilitating and potentially irreversible harm to Ulises, who did not consent to this contact.

128. Throughout the entire course of the arrest, Ulises posed no threat to Defendant's employees or any other person. Ulises never resisted arrest and was attempting to calmly cooperate with the ICE officers.

129. Defendant's employees' use of force was unreasonable, unjustified and in excess of lawful authority. Defendant's employees' conduct was intentional, willful, and malicious.

130. As a direct and proximate cause of that intentional conduct, federal employees caused Ulises to suffer harm and injuries, including physical injuries, pain, suffering, loss of freedom, loss of enjoyment of life and a loss of earnings and earning potential.

131. Under the FTCA, the United States is liable to Ulises for the torts of assault and battery under the laws of the State of California and for damages arising from that assault and battery.

**SIXTH CAUSE OF ACTION**
**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(Ulises as to DHS-ICE, GEO Group, CoreCivic)**

132. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

133. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in any program or activity receiving federal financial assistance, or conducted by any Executive agency. 29 U.S.C. § 794. Damages may be recovered against government contractors under the Rehabilitation Act.

134. At all times relevant to this action, Plaintiff Ulises is an individual with a disability because he is an individual who "has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102); *see also* 6 C.F.R. § 15.3(d). Ulises is also qualified as an individual that meets the "essential eligibility requirements for participation in, or receipt of benefits from, that program or activity" because he was detained by Defendant DHS-ICE in immigration detention facilities GSA and California City. 6 C.F.R. § 15.3(e)(2). DHS defines "program or activity" to cover anything a federal agency does. *See* Megan H. Mack, U.S. Dep't of Homeland Sec. Guide 065-01-001-01, Component Self-Evaluation & Planning Reference Guide (2016) at 23 (explaining that "a federally conducted program or activity is anything a federal agency does," including "enforcement of immigration laws and operation of immigrant detention facilities.")

135. At all times relevant to this action, Defendant DHS-ICE is a federal executive agency within the meaning of the Rehabilitation Act. As such, they are required to comply with the provisions of Section 504, and its implementing regulations.

136. DHS regulations implementing the Rehabilitation Act apply to DHS and its components, including ICE. *See* 6 C.F.R. § 15.1. These regulations prohibit Defendants, in providing any aid, benefit, or service from "directly or through contractual, licensing, or other arrangements" from discriminating on the basis of disability, which includes such actions as "[d]eny[ing] a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or

service" of the agency, and "[p]rovid[ing] a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result . . . as that provided to others." 6 C.F.R. § 15.30(b)(1)(i), (iii). DHS regulations also require Defendants to "take appropriate steps to effectively communicate with . . . participants" which includes "furnish[ing] appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity." 6 C.F.R. § 15.60(a)(1). Thus, Defendant DHS-ICE is legally responsible for all violations of Section 504 committed by their contractors arising from their operation of detention facilities. 6 C.F.R. § 15.30(b)(1).

137. Defendant GEO Group operates, and at all times relevant, operated, at least one program or activity for DHS-ICE for which it receives federal financial assistance. This includes the general operation and administration of ICE's detention program at GSA, including its medical program and disability accommodations processes. DHS-ICE considers the operation of immigration detention facilities to be a federally conducted program for purposes of the Rehabilitation Act, and the agency contracts with GEO Group for the performance of this program on its behalf at GSA.

138. Defendant CoreCivic operates, and at all times relevant, operated, at least one program or activity for DHS-ICE for which it received federal financial assistance. This includes the general operation and administration of ICE's detention program at California City, including its medical program and disability accommodations processes. DHS-ICE considers the operation of immigration detention facilities to be a federally conducted program for purposes of the Rehabilitation Act, and the agency contracts with CoreCivic for the performance of this program on its behalf at California City.

139. Defendants are, and were, at all times relevant to this action, required to affirmatively identify Ulises as an individual with a disability and take all steps necessary to ensure that he had meaningful access to all aspects of the immigration arrest, detention and processes by modifying any policies or procedures necessary to ensure his health and safety, which may include provision of accommodations, and auxiliary aids and services to ensure effective communication.

140. Defendants are, and were, at all times relevant to this action, required to reasonably

accommodate Plaintiff Ulises's disabilities by providing him with access to programs, services and activities during arrest, transport and detention and during immigration detention, including access to adequate medical and mental health care for the management of his physical and mental disabilities, and accommodations so that he could meaningfully access and participate in all aspects of the immigration detention and processing system. Defendants are, and were at all times relevant, required to provide auxiliary aids and services for Ulises's sensory disabilities to ensure he had effective communication throughout his immigration detention.

141. Defendant DHS-ICE is also directly responsible for their systemic use of deficient monitoring and oversight practices and policies that result in the denial of detained individuals with disabilities' rights under Section 504. *Id.* Defendants are, and were at all times relevant to this action, obligated to affirmatively identify Ulises as an individual with a disability and take all steps necessary to ensure that he had meaningful access to all aspects of the immigration detention and processing system.

142. Defendant DHS-ICE failed to comply with its obligations under Section 504 and its implementing regulations when it failed to ensure that Ulises received appropriate identification and accommodation of his disabilities during his arrest and transport to the emergency room.

143. All Defendants failed to comply with their obligations under Section 504 and its implementing regulations when they:

a. Failed to properly identify and engage in the interactive process with Ulises to determine his disabilities and what accommodations would be needed to ensure meaningful access during his arrest and transport;

b. Failed to properly identify and engage in the interactive process with Ulises to determine his disabilities and what accommodations would be needed to ensure meaningful access throughout his detention;

c. Failed to accommodate Ulises's access to appropriate medical and mental health services necessary to control the symptoms of his heart and neurological, and mental health disabilities;

d. Failed to provide necessary accommodations, or auxiliary aids or services, for Ulises's hearing and vision loss to ensure effective communication;

e. Forced Ulises into segregated setting because of his disabilities, denying him access to services and programs that would have been available to him had he not been in segregation;

f. Failed to accommodate Ulises's mental health disabilities; and

g. Denied Ulises access to his cane, which he needed to ambulate.

144. As a direct and proximate result of Defendants' failures to comply with their obligations under Section 504, Ulises was denied meaningful access to the programs, services and activities of immigration detention, and effective communication solely on the basis of his disability. Defendants' discrimination against Ulises caused him harm, including physical injuries, the deterioration of his physical condition, and decompensation of his mental health. As a result, he has suffered a loss of earnings and earning potential and Defendants are liable for damages arising from those violations.

**SEVENTH CAUSE OF ACTION**
**Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)**
**(Ulises as to DHS-ICE)**

145. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

146. The DHS, and its component ICE, is an "agency" under the APA. 5 U.S.C. § 551(1). Defendant ICE is overseen by DHS whose actions are subject to judicial review under the APA. 5 U.S.C. § 701, 704. Defendants are all proper defendants subject to APA review. 5 U.S.C. § 702.

147. Agency action that is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" is unlawful and courts are required to set aside such action. 5 U.S.C. § 706(2)(A), (C).

148. Review of agency action for compliance with a federal statute is available under the APA, even where the statute lacks a right of action. *Chrysler Corp. v. Brown*, 441 U.S. 281, 317-19

(1979).

149. The APA requires that agencies comply with their own policy statements, agency manuals, or other forms of guidance documents and internal procedures adopted without notice-and-comment. *See Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004).

150. Defendant DHS-ICE's violations of Section 504 of the Rehabilitation Act (as described above) constitute final agency action reviewable under the APA.

151. Defendant DHS-ICE's failure to comply with the PBNDS, including but not limited to: Sections 2 (Security), 4 (Care), 5 (Activities), 6 (Justice), and 7 (Administration and Management); the NDS Sections 1 (Safety), 4 (Care), 5 (Activities), and 6 (Justice); ICE Directive 11065.1 Review of the Use of Segregation for ICE Detainees (September 4, 2013); ICE Policy Number 24002 Review of the Use of Special Management Units for ICE Detainees (December 6, 2024); and ICE Directive 6000 Assessment and Accommodations for Detainees with Disabilities (February 26, 2025) constitutes final agency action reviewable under the APA.

152. As described above, Defendant DHS-ICE's actions are contrary to law and in excess of statutory authority, and violate the agency's own procedures, guidance and policy. Ulises suffered harm as a result of those violations and Defendants are liable for damages arising from that harm.

**EIGHTH CAUSE OF ACTION**
**Violation of the Due Process Clause of the Fifth Amendment (Inadequate Medical Care)**
**(Ulises as to DHS-ICE)**

153. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

154. Defendant DHS-ICE deprived Plaintiff Ulises adequate and necessary medical care by, without limitation:

a. Failing to provide and/or failing to provide in a timely manner consistent with medical standards necessary specialty care such as imaging and specialist consultations.

b. Failing to ensure continuity of care, such as continuity of prescription medication and mobility devices, including upon transfer from GSA to

California City.

c. Failing to provide a functional process by which Ulises could seek and timely receive non-emergency medical or mental health care.

155. Defendant DHS-ICE made an intentional decision to detain Ulises in conditions where, based on Defendant's and its contractors' practices and policies, he was exposed to a significant risk of serious harm. Defendant DHS-ICE has been and is currently aware of the conditions, conduct and deprivations complained of herein and have condoned or been deliberately indifferent to such conduct.

156. Defendant DHS-ICE has not taken reasonable available measures to abate this risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved. By not taking such measures, Defendant DHS-ICE has caused Ulises to face a significant risk of harm. These actions violate Ulises's rights under the Due Process Clause of the Fifth Amendment.

**NINTH CAUSE OF ACTION**
**Disability Discrimination, California Civil Code §§ 51, 52 (Unruh Act)**
**(Ulises as to GEO Group & CoreCivic)**

157. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

158. Plaintiff Ulises is an individual with a disability as defined by Cal. Civ. Code §§ 12926, 12926.1.

159. Defendants GEO Group (and its facility GSA) and CoreCivic (and its facility California City) are business establishments doing business in California and are otherwise governed by California laws protecting the rights of individuals with disabilities.

160. Defendants GEO Group and CoreCivic denied, aided in denial of, made a distinction that denied, and/or discriminated against Ulises resulting in a denial to him of his full and equal access to advantages, accommodations, facilities, privileges, and services, including:

a. Failure to accommodate Ulises's access to appropriate medical and mental health services necessary to control the symptoms of his heart and

neurological, and mental health disabilities;

b. Failure to accommodate his need for mobility accommodations, including assignment to a lower bunk;

c. Failure to provide necessary accommodations for Ulises's hearing and vision loss;

d. Forcing Ulises into segregated setting because of his disabilities, denying him access to services and programs that would have been available to him had he not been in segregation;

e. Failure to accommodate Ulises's mental health disabilities; and

f. Denying Ulises access to his cane, which he needed to ambulate.

161. The conduct of Defendants GEO Group and CoreCivic, as previously described, was intentional because Ulises suffered verbal threats and humiliation by GEO Group and CoreCivic staff on account of his disabilities, or the conduct was at least committed with deliberate indifference.

162. As a direct and proximate result of Defendants' failures to comply with their obligations under Section 504, Ulises was denied meaningful access to the programs, services and activities of immigration detention, as well as denial of effective communication, solely on the basis of his disability. Defendants' discrimination against Ulises caused him harm, including physical injuries, the deterioration of his physical condition and decompensation of his mental health, and loss of earnings and earning potential. Defendants GEO Group and CoreCivic are liable for damages arising from that harm.

163. Defendants GEO Group and CoreCivic acted with malice and oppression toward Ulises, based on their position of authority and control over Ulises and were on notice of and authorized its staff to ignore medical and disability directives when processing, evaluating, assigning and denying medical care and accommodations to Ulises. Further, on information and belief, Defendants GEO Group and CoreCivic fraudulently reported that they had complied with all contractual terms of their agreement with Defendant DHS-ICE. Ulises is, therefore, entitled to recover punitive damages pursuant to Cal. Civ. Code § 3294, in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**California Civil Code § 52.1 (Bane Act)**
**Federal Tort Claims Act (28 U.S.C. § 2671 et seq)**
**(Ulises as to DHS-ICE)**

164. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

165. This cause of action is asserted against Defendant DHS-ICE under the FTCA for violations of California Civil Code Section 52.1, known as the Bane Act. Pursuant to the Ninth Circuit's decision in *Xue Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010), the FTCA's waiver of sovereign immunity extends to Bane Act claims.

166. The Bane Act provides a private right of action against any person who interferes with or attempts to interfere with an individual's exercise or enjoyment of their constitutional or statutory rights by threats, intimidation, or coercion.

167. Defendant DHS-ICE intentionally interfered with or attempted to interfere with Plaintiff Ulises's exercise and enjoyment of statutory and constitutional rights by threats, intimidation, or coercion.

168. As alleged herein, Defendant DHS-ICE interfered with or attempted to interfere by threats, intimidation, violence, and coercion with Plaintiff Ulises's rights under, including but not limited to, California Civil Code Sections 43 (protection from bodily harm), 51 (disability discrimination); California Penal Code Sections 149 (protection from assault or beating without lawful authority by law enforcement officer), 240 (protection from assault), 242 (protection from battery); California Constitution Article 1 Sections 1 (right to privacy), 7 (equal protection and due process), 13 (protection from unreasonable searches and seizures), 17 (protection from cruel and unusual punishment); Section 504 of the Rehabilitation Act (disability discrimination); the Fourth Amendment of the U.S. Constitution (protection from unreasonable searches and seizures); the Fifth Amendment of the U.S. Constitution (due process); the Eighth Amendment of the U.S. Constitution (protection from cruel and unusual punishment); and the 14th Amendment of the U.S. Constitution (equal protection and due process).

169. As described above, the ICE officers, in the course of arresting Plaintiff Ulises for an alleged civil (not criminal) violation, engaged in excessive force, holding Ulises at gunpoint, using their batons, and physically beating and kicking him, despite Ulises's calm attempt to cooperate and comply with his arrest. This intentional violence and intimidation reasonably caused Ulises to feel threatened and intimidated from exercising his rights. Further, their constant presence in the ambulance, and their continued presence and intimidating actions where they towered over Ulises laying in his hospital bed and prevented him from sharing information about his pain and injuries with medical staff in the emergency room prevented Ulises from enjoying and receiving his rights to medical care and access to counsel in a fully confidential and private setting. Defendant DHS-ICE's intentional failure to ensure, or reckless disregard as to the probability, that Ulises's detention at both GSA and California City did not amount to punishment, and their failure to abate a known risk that Ulises would be subject to serious risk of harm interfered with and caused Ulises to feel intimidated from exercising his rights in detention.

170. Defendant DHS-ICE's conduct caused catastrophic, potentially irreversible physical and mental health harm as described above, including the deterioration of his physical condition, decompensation of his mental health and loss of earnings and earning potential.

171. As a result of the ICE officers' conduct, DHS-ICE is liable for Ulises's injuries under the doctrine of respondeat superior and the FTCA.

172. Ulises brings this claim seeking all damages under state law, including treble damages pursuant to Civil Code Section 52.1.

**ELEVENTH CAUSE OF ACTION**
**California Civil Code § 52.1 (Bane Act)**
**(Ulises as to GEO Group, CoreCivic)**

173. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

174. The Bane Act provides a private right of action against any person who interferes with or attempts to interfere with an individual's exercise or enjoyment of their constitutional or statutory rights by threats, intimidation, or coercion.

175. Defendants GEO Group and CoreCivic, and their employees and contractors, intentionally interfered with or attempted to interfere with Plaintiff Ulises's exercise and enjoyment of statutory and constitutional rights by threats, intimidation, or coercion.

176. As alleged herein, Defendants GEO Group and CoreCivic, and their employees and contractors interfered with or attempted to interfere by threats, intimidation, violence, and coercion with Plaintiff Ulises's rights under, including but not limited to, California Civil Code Sections 43 (protection from bodily harm), 51 (disability discrimination); Section 504 of the Rehabilitation Act (disability discrimination); California Constitution Article 1 Sections 1 (right to safety), 7 (equal protection and due process), 17 (protection from cruel and unusual punishment); the Fifth Amendment of the U.S. Constitution (due process), the Eighth Amendment of the U.S. Constitution (protection from cruel and unusual punishment); and the Fourteenth Amendment of the U.S. Constitution (equal protection and due process).

178. As described above, GEO Group's and CoreCivic's, and their employees' and contractors' intentional, intimidating, and coercive actions, including but not limited to denial or delay of appropriate and necessary medication, medical and mental health care, verbal harassment, and improper use of solitary confinement, caused Ulises to reasonably believe that if he exercised his statutory and constitutional rights, including but not limited to his right to receive appropriate medical care and disability accommodations, to be housed in a less restrictive setting than solitary confinement, and to access counsel, GEO Group or CoreCivic and their employees and contractors would commit an act of violence against him.

178. Defendant GEO Group's and CoreCivic's and their employees' and contractors' conduct caused catastrophic, potentially irreversible physical and mental health injuries as described above, including the deterioration of his physical condition, decompensation of his mental health, and loss of earnings and earning potential.

179. Defendants GEO Group and CoreCivic acted with malice and oppression toward Ulises, based on their position of authority and control over Ulises and were on notice of and authorized their staff to ignore medical and disability directives when processing, evaluating,

assigning and denying medical care and accommodations to Ulises. Further, on information and belief, GEO Group and CoreCivic fraudulently reported that they had complied with all contractual terms of their agreements with Defendant DHS-ICE. Thus, Ulises is entitled to recover punitive damages pursuant to Cal. Civ. Code § 3294, in an amount to be proven at trial.

180. Ulises brings this claim seeking all damages under state law, including treble damages pursuant to Civil Code Section 52.1.

**TWELFTH CAUSE OF ACTION**
**Violation of Detention Standards, California Government Code § 7320**
**(Ulises as to GEO Group & CoreCivic)**

181. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

182. Defendants GEO Group and CoreCivic are both private detention facility operators.

183. Defendants GEO Group and CoreCivic are required to exercise a duty of ordinary care and skill in adhering to detention standards of care agreed upon, respectively, in the GSA and California City detention center contracts.

184. At all times relevant to this complaint, Defendant GEO Group and Defendant DHS-ICE were parties to Contract No. 70CDCR20D00000008, providing that GEO Group would undertake responsibility for the housing, medical care and related services to be provided to certain individuals, detained and assigned by Defendant DHS-ICE to the GEO Group facility known as GSA. Plaintiff Ulises was an individual detained by DHS-ICE and housed at GSA under the terms and conditions of that Contract.

185. Defendant GEO Group had a duty to treat Ulises in a manner consistent with the standards of medical care, and requirements for accommodations for detainees with disabilities expressed in, or incorporated by reference into the contractual agreement between GEO Group and Defendant DHS-ICE. Under the terms of that contract GEO Group was required to comply with the following detention standards of care and confinement agreed upon in the facility's contract for operations, including:

a. 2011 Performance Based National Detention Standards (PBNDS 2011) as

revised in December 2016;

b. American Correctional Association (ACA) standards; and

c. National Commission on Correctional Health Care (NCCHC) Standards.

186. Under the direction and control of GEO Group, GSA staff intentionally or with negligent disregard for the health, safety and well-being of Ulises violated the detention standards of care and confinement agreed upon in the facility's contract for operations, as alleged herein. As a direct and proximate result of those violations, Ulises suffered extreme pain, suffering, exacerbation of his disabilities and deterioration of his physical and mental health, as well as emotional distress and loss of earning and earning potential, and is entitled to damages in an amount to be proven at trial.

187. Defendant GEO Group acted with malice and oppression toward Ulises, based on its position of authority and control over Ulises and was on notice of and authorized its staff to ignore medical and disability directives, policies, and standards when processing, evaluating, assigning and denying medical care and accommodations to Ulises. Further, on information and belief, GEO Group fraudulently reported that it had complied with all contractual terms of its agreement with Defendant DHS. Thus, Ulises is entitled to recover punitive damages pursuant to Cal. Civ. Code § 3294, in an amount to be proven at trial.

188. At all times relevant to this complaint, Defendant CoreCivic and Defendant DHS-ICE were parties to Contract No. 70CDCR25D00000010/P00004 providing that CoreCivic would undertake responsibility for the housing, medical care and related services to be provided to certain individuals, detained and assigned by Defendant DHS-ICE to the CoreCivic facility known as California City. Plaintiff Ulises was an individual detained by DHS-ICE and housed at the California City detention center under the terms and conditions of that Contract.

189. Defendant CoreCivic had a duty to treat Ulises in a manner consistent with the standards of medical care, and requirements for accommodations for detainees with disabilities expressed in, or incorporated by reference into the contractual agreement between CoreCivic and Defendant DHS-ICE. Under the terms of that contract, CoreCivic was required to comply with the

following detention standards of care and confinement agreed upon in the facility's contract for operations:

a. ICE National Detention Standards (NDS) 2025;

b. American Correctional Association (ACA) standards for Adult Local Detention Facilities (ALDF); and

c. Additional standards written out in the Contract on pages 4-81.

190. Under the direction and control of CoreCivic, California City staff intentionally or with negligent disregard for the health safety and well-being of Ulises violated the detention standards of care and confinement agreed upon in the facility's contract for operations, as alleged herein. As a direct and proximate result of those violations, Ulises suffered extreme pain, suffering, exacerbation of his disabilities and deterioration of his physical and mental health, as well as emotional distress and loss of earning and earning potential, and is entitled to damages, in an amount to be proven at trial.

191. Defendant CoreCivic acted with malice and oppression toward Ulises, based on its position of authority and control over Ulises and was on notice of and authorized its staff to ignore medical and disability directives, policies, and standards when processing, evaluating, assigning and denying medical care and accommodations to Ulises. Further, on information and belief, CoreCivic fraudulently reported that it had complied with all contractual terms of its agreement with Defendant DHS. Thus, Ulises is entitled to recover punitive damages pursuant to Cal. Civ. Code § 3294, in an amount to be proven at trial.

192. Defendants GEO Group's and CoreCivic's above-described acts toward Ulises constituted tortious actions.

193. Defendants GEO Group's and CoreCivic's tortious actions in violation of the requirements of the PBNDS and NDS, respectively, caused Ulises's injuries, including physical pain, emotional distress, psychological trauma, physical deterioration, and mental deterioration and a loss of earnings and earning potential. Defendants GEO Group and CoreCivic are liable for damages arising from that harm.

194. GEO Group and CoreCivic did not exercise ordinary care, as they failed to substantially comply with the PBNDS and NDS, respectively.

**THIRTEENTH CAUSE OF ACTION**
**Negligence, California Civil Code § 1714**
**(Ulises as to GEO Group & CoreCivic)**

195. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

196. Defendants GEO Group and CoreCivic owed a duty of care to Plaintiff Ulises so as not to cause him injury or harm.

197. By engaging in the acts alleged herein, the employees and contractors of GEO Group and CoreCivic referenced above failed to act with ordinary care and breached their duty of care owed to Ulises when they failed to adhere to federal disability laws, the terms of their contracts with Defendant DHS-ICE, and the mandatory and binding requirements of the NDS, PBNDS, and ICE directives referenced above.

198. As a direct and proximate result of Defendants GEO Group's and CoreCivic's breach, Ulises suffered substantial injuries, including physical pain, emotional distress, psychological trauma, physical deterioration, mental deterioration and a loss of earnings and earning potential. Defendants GEO Group and CoreCivic are liable for damages arising from that harm.

199. Defendants GEO Group and CoreCivc acted with malice and oppression toward Ulises, based on their position of authority and control over Ulises, and were on notice of and authorized their staff to ignore medical and disability directives when processing, evaluating, assigning, and denying medical care and accommodations to Ulises. Further, on information and belief, GEO Group and CoreCivic each fraudulently reported that they had complied with all contractual terms of their agreements with Defendant DHS-ICE. Thus, Ulises is entitled to recover punitive damages pursuant to Cal. Civ. Code § 3294, in an amount to be proven at trial.

## CAUSES OF ACTION FOR ABY PEÑA

### FOURTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Aby as to the United States)

200. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

201. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

202. At all relevant times, the federal ICE employees referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

203. By engaging in the acts described above, the federal ICE employees and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard as to the probability of causing Aby to suffer severe emotional distress when they violently arrested Aby's husband, Ulises, in front of her.

204. As a direct and proximate cause of that conduct, Aby suffered, and continues to suffer, severe emotional distress.

205. Under the FTCA, the United States is liable to Aby for the tort of intentional infliction of emotional distress under the laws of the State of California, and damages for the harm she suffered.

### FIFTHTEENTH CAUSE OF ACTION
### Negligence (Emotional Distress)
### (Aby as to the United States)

206. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

207. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

208. At all relevant times, the federal ICE employees referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

209. The federal ICE employees and officials referenced above had a duty to Aby to act with ordinary care and prudence so as not to cause harm or injury to Aby when they violently arrested Aby husband, Ulises, in front of her.

210. By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Aby.

211. As a direct and proximate result of the conduct, Aby suffered substantial emotional distress.

212. Under the FTCA, the United States is liable to Aby for the tort of negligence under the laws of the State of California, and damages for the harm she suffered.

**SIXTEENTH CAUSE OF ACTION**
**Negligence (Property Damage)**
**(Aby as to the United States)**

213. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

214. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

215. At all relevant times, the federal ICE employees referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

216. By engaging in the acts described in this Complaint, the federal employees and officials referenced above had a duty to Plaintiff Aby to act with ordinary care and prudence so as

not to cause physical damage to her truck. The federal employees and officials referenced above breached that duty when they unnecessarily and violently struck their batons on Aby's truck causing physical damage to the window and body of the truck.

217. The actions of the federal employees referenced above were the direct and proximate cause of the physical damage to Aby truck.

218. Under the FTCA, the United States is liable to Aby for the tort of negligence under the laws of the State of California, and the damage to her truck for an amount to be proven at trial.

## CAUSES OF ACTION FOR E.P.

### SEVENTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (E.P. as to the United States)

219. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

220. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

221. At all relevant times, the federal ICE employees referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

222. By engaging in the acts described above, the federal employees and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard as to the probability of causing E.P. to suffer severe emotional distress when they violently arrested E.P.'s father, Ulises, in E.P.'s view.

223. As a direct and proximate cause of that conduct, E.P. suffered, and continues to suffer, severe emotional distress.

224. Under the FTCA, the United States is liable to E.P. for the tort of intentional infliction

of emotional distress under the laws of the State of California, and damages for the harm she suffered.

**EIGHTEENTH CAUSE OF ACTION**
**Negligence (Emotional Distress)**
**(E.P. as to the United States)**

225. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

226. The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

227. At all relevant times, the federal ICE employees referenced above acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

228. The federal employees and officials referenced above had a duty to E.P. to act with ordinary care and prudence so as not to cause harm or injury to E.P.

229. By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to E.P. when they violently arrested E.P.'s father, Ulises, in E.P.'s view.

230. As a direct and proximate result of the conduct, E.P. suffered substantial emotional distress.

231. Under the FTCA, the United States is liable to E.P. for the tort of negligence under the laws of the State of California, and damages for the harm she suffered.

**PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court assume jurisdiction over this action and issue a judgment granting Plaintiffs:

1. Actual damages according to proof;

2. Compensatory damages according to proof;

3. Punitive damages, according to proof;

4. Declare that Defendants have violated the Rehabilitation Act and the Administrative Procedure Act by failing to provide reasonable accommodations for Ulises's disabilities while he was detained.

5. Declare that conditions of confinement at GSA and California City are unconstitutional because those conditions deprived Ulises of adequate health care in violation of the Fifth Amendment.

6. Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; 29 U.S.C. § 794a(b), Cal. Gov. Code § 7320(c) Cal. Civ. Code § 52(b)(3), and Cal. Civ. Code § 52.1(i); and

7. Such other and further relief as the Court may deem just and appropriate, including all equitable relief to which Plaintiffs are entitled.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury for all claims and causes of action triable before a jury.

Respectfully submitted,

Dated: July 6, 2026

DISABILITY LAW UNITED

By:

*/s/ Cynthia Rice*______
Cynthia Rice
Laura Murchie
DISABILITY LAW UNITED

*Attorneys for Plaintiffs*

Dated: July 6, 2026

PANGEA LEGAL SERVICES

By:

*/s/ Elena Hodges*________
Elena Hodges
PANGEA LEGAL SERVICES

*Attorney for Plaintiffs*